UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TONY DEWAYNE BEARD, JR.,
a legally incapacitated person,
by and through JOHNETTE FORD,
his legal guardian,

        Plaintiff,               Civil Action No. 14-13465
                                    Honorable Nancy G. Edmunds
v.                              Magistrate Judge Elizabeth A. Stafford

ERIC HAWKINS, *et al.*,

        Defendants.
_____/

## REPORT AND RECOMMENDATION THAT DEFENDANTS' MOTION FOR SANCTIONS [R. 99] BE GRANTED IN PART AND DENIED IN PART

### I.   INTRODUCTION

Johnette Ford commenced this action on behalf of her adult son Tony

Dewayne Beard, Jr., alleging the City of Southfield and fourteen current or

former members of the Southfield Police Department (collectively

"defendants") violated his constitutional rights and state law.  [R. 1].  In a

December 2015 deposition, Ford testified that she maintained several

handwritten notebooks and personal journals about the "hell" that she and

Beard had suffered.  She emphatically objected when told during the

deposition that defense counsel would be requesting copies of those

journals.  Then, after a request to produce was served, plaintiff alleged that the documents were private, then that they were destroyed, and finally that they never existed.  For the reasons described below, the Court **RECOMMENDS**:

- **GRANTING IN PART** defendants' motion for sanctions [R. 99], finding that attorney Johnny L. Hawkins' conduct is sanctionable pursuant to Federal Rules of Civil Procedure 26 and 37, and that both Hawkins and Ford should be sanctioned under the Court's inherent authority;

- **ORDERING** Hawkins to reimburse defendants for half the reasonable expenses, including attorney's fees, they incurred from the litigation of their motion for sanctions;

- **ORDERING**, pursuant to plaintiff's stipulation and as a sanction, that Tenisha Mayfield (Ford's daughter and Beard's sister) take the place of Ford as Beard's guardian and representative in this action;

- **ORDERING**, pursuant to plaintiff's stipulation and as a sanction, that his claim for deliberate indifference to his serious medical needs be stricken;

- **ORDERING** that Ford cannot testify in Beard's case in chief, but that defendants retain the right to call her for impeachment purposes; and

2

- **DENYING** defendants' request for dismissal.

## II.    BACKGROUND

Defendants' October 23, 2015 *duces tecum* deposition notice instructed Ford to produce at her December 3, 2015 deposition "[a]ll documentary evidence, including photographs, charts, diagrams, journals, correspondence, emails, medical records, etc. which are in his [sic] possession regarding this matter." [R. 62-4, PgID 844]. Ford brought a binder with some of these documents to the deposition, but when asked whether she had other case related documents, she replied, "I sure do." [R. 62-3, PgID 775-76]. She testified that she maintained a computer log of Beard's interaction with the police and his daily activities, and a separate journal about the "hell" that she and Beard went through. [*Id.*, PgID 782-83]. Ford said that she noted observations regarding how Beard was doing in her personal journal. "I don't put everything on the computer. The more personal things how he's doing I keep in my private journal." [*Id.*, PgID 784].

Ford described the personal journal as a two-book "paper document" that she maintained since the September 2011 incident. [*Id.*, PgID 785-86]. The journal contained her "private feelings about my son, what he's going through emotionally and psychologically"; thoughts that were not "any of

3

your business." [*Id.*, PgID 785]. When asked if anyone had access to her journal, she replied that no one is supposed to but she has grandchildren and a nosey daughter. [*Id.*, PgID 786]. According to Ford, she also maintained six or seven notebooks documenting what Beard was going through, but that she went into more depth in her personal journal. [*Id.,* PgID 786-87]. The notebooks were also in hardcopy, and not electronic. [*Id.*, PgID 787].

Near the end of the deposition, defense counsel told Ford that he would be requesting a copy of her journal and asked her not to destroy or modify it, but she replied that she would not turn it over: "No you're not getting my journal. That's my personal thoughts about what my son went through, how he's feeling and how he was treated." [R. 62-3, PgID 794-95]. When Hawkins explained the limits to privacy in lawsuits, Ford responded, "Well, I don't care." [*Id.*, PgID 795].

When Ford appeared at the deposition, her demeanor prompted defense counsel to question whether she had taken any medication that affected her ability to hear, think or respond, but Ford assured that she had taken only Motrin. [*Id.*, PgID 718].

After the deposition, defendants served a Third Request for Production of Documents, requesting "in its native form, a copy of all logs

4

and/or blogs kept by Johnette Ford, including, but not limited to, those to which she testified she maintained on her computer," "a copy of all journals kept by Johnette Ford," and "a copy of all diaries kept by Johnette Ford." [R. 62-8, PgID 856-58]. Plaintiff responded to each request, "Plaintiff objects to same, and in support thereof, contends pursuant to FRCP 26(b) and 26(b)(5) that said information is both privileged and not relevant to the claim now before this court seeing that said information consists solely of either personal diaries, logs, notebooks and/or journals created by Ms. Ford." [*Id.*]. No privilege log was included.

Defendants thus filed a motion to compel, among other things, documentary evidence that Ford testified in a deposition to having in her possession, including handwritten journals and a computer log. [R. 62]. Hawkins filed a response on February 18, 2016 to "clarify" that the handwritten logs and journals that Ford "may have" were "some time ago, eventually typed into Word or WordPerfect format, with the original handwritten documents then being trashed and/or thrown out, and thus no notebooks or other logs of any sort existed when she appeared for her discovery deposition on Dec. 3, 2015, or thereafter." [R. 69, PgID 961]. On the same date, Hawkins delivered to defendants attendant care records that Ford had prepared for Beard's insurance claim that covered only 2014

5

and 2015.  [R. 99, PgID 1368; R. 99-2, PgID 1385-1440].  The documents were not provided in conjunction with a formal response to a request to produce as required by Federal Rule of Civil Procedure 34(b)(2)(B)[1] and (C)[2], and were not certified with Hawkins' signature as required by Federal Rule of Civil Procedure 26(g)(1).

The Court held a hearing on the motion to compel on February 22, 2016, during which Hawkins reiterated that Ford had "said to me in good faith that what I am now saying to you is in fact true that she basically converted all the material that she had to Word Perfect or computer generated docs in the past."  [R. 130, PgID 4150]. Unpersuaded, the Court ordered Ford to submit to a limited deposition to address the plain inconsistency between her deposition testimony and the representations in the response to the motion to compel.  [*Id.*]. The Court warned:

> Ms. Ford, I will direct this to you. . . . I think that you have raised a significant question regarding the treatment of your son. I'm not suggesting that you will prevail or that your claim has merit, but it certainly is one that needs serious consideration. And if you are withholding discovery, then you are jeopardizing this case.

---

[1] "For each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. . . ."  Rule 34(b)(2)(B).

[2] "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Rule 34(b)(2)(C).

[*Id.,* PgID 4151].[3]

At the March 23, 2016 limited deposition that followed, Ford testified that the two books and six or seven journals she had testified still existed; she did not destroy them, and saying that she had would be a lie. [R. 99-3, PgID 1448-49]. She did not bring those documents because they were too much to bring. [*Id.,* PgID 1449]. In a change from her December 2015 deposition, she said that her journals did not include her private thoughts; they were just personal because they belonged to her. [*Id.*, PgID 1471-73]. She did not know why she had testified to having books with her personal thoughts. [*Id.,* PgID 1475]. "I have to admit I might have told you, I might have told you anything." [*Id.*]. She said that she had taken medicine due to surgery a couple of months before her December 2015 deposition and may have been high. [*Id.*, PgID 1482-83].

Just prior to the deposition, plaintiff provided defendants with photographs that Ford testified depicted "case stuff, stuff pertaining to my son's criminal and civil trial" that were taken at her home earlier that day. [*Id.*, PgID 1451-53]. When asked why she did not bring those materials to

---

[3] In an order following the hearing, the Court again noted that Hawkins' response that all handwritten journals had been converted to electronic form "some time ago" was in direct contradiction to deposition testimony. [R. 72, PgID 1000-01].

the deposition, Hawkins interjected with a privilege objection that he indicated the Court still had to resolve, [*Id.*, PgID 1454], even though he had not filed a motion for protective order or prepared a privilege log.  Ford stated that the materials shown in the photographs had been in storage since before December 2015, that they were case related and that they had not been inventoried. [*Id.,* PgID 1456-60].  She testified that she threw away some materials related to her son's case since the December 2015 deposition because they were duplicates or were transferred, and then referred to the attendant care log that she prepared for an insurance adjustor.  [*Id.*, PgID 1450].

Following the limited deposition, defendants filed the instant motion for sanctions, and the Court ordered an evidentiary hearing. [R. 99; R. 114]. In the notice of hearing, the Court warned Ford and Hawkins that their abuse of discovery would subject them to sanctions, including financial sanctions and the possible dismissal of the case, and that they bore the burden of proving that their failure to comply with discovery obligations was not due to willfulness, bad faith or fault.  [R. 114, PgID 1936-37].  Plaintiff then filed a supplemental brief with an "inventoried catalog of materials" that Hawkins had personally delivered on May 23, 2016. [R. 123, R. 123-1]. But the inventory did not list any logs, private books or journals; Hawkins

8

did not identify the connection between the inventoried documents and any particular document request; he did not provide a Rule 26(g)(1) certification; and the inventory was not accompanied by a response that complied with Rule 34(b)(2). [*Id.*, R. 123-1].

At the beginning of the June 1, 2016 hearing, Hawkins stated that he had warned Ford about the fact that they were in conflict for the purposes of the sanctions hearing, and she acknowledged understanding that she was responsible for either hiring her own attorney or representing herself at the hearing. [R. 133, PgID 4195-4200].  After a break, the Court announced that it would not go forward with a joint hearing that day against Hawkins and Ford due to that possible conflict of interest; the hearing was going forward that day only against Hawkins.[4]  [*Id.*, PgID 4217-23].

---

[4] The Court was guided by *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 636 (6th Cir. 2009), which stated:

> Courts must be particularly careful in conducting hearings to determine whether sanctions should be imposed against both plaintiffs and their attorneys for bringing frivolous claims. These situations are especially prone to raise conflicts of interest because each has an incentive to blame the other for bringing the frivolous claims at issue. In addition, such cases create an incentive for attorneys to abandon their clients in order to avoid personal liability.

*See also Eastway Const. Corp. v. City of New York*, 637 F. Supp. 558, 570 (E.D.N.Y. 1986) ("The implications of such a hearing, turning attorney against client, and the effect on attorney-client privilege and trust, may be devastating.").

Ford took the stand and, when asked whether she had documents responsive to the motion to compel, she replied, "[S]ome I do, some I don't."  [R. 133, PgID 4248].  She testified that, when discussing the motion to compel with Hawkins, she had told him that some of the materials may have been destroyed and that some of them may have been stored.  [*Id.*, PgID 4248].  Ford did not recall whether she told Hawkins that her handwritten logs and journals were typed into Word or WordPerfect format.  [*Id.*, PgID 4280].  When she was asked whether the notebooks, binders, handwritten notes or computer documents she had testified about in her December 2015 deposition existed, she replied, "I'm not going to say that because I wouldn't know the truth.  I'm not going to lie and I'm not going to guess."  [*Id.*, PgID 4258]. Asked whether she told the truth at the December 2015 deposition, she stated, "I might have told you anything at my first deposition.  I don't remember.  I was on medication . . . ."  [*Id.*, PgID 4260].

According to Ford, Hawkins was shocked and angry when, on the day of the limited deposition, he saw all of the materials that Ford had.  [R. 133, PgID 4248-49, 4282].  She said that her family members had stored away those documents when cleaning up her room before her October 2015 surgery.  [*Id.*, PgID 4250-51].  During the hearing, Ford testified both that she knew and that she did not know that the materials were case

10

related, but that in any case she made no effort to check prior to the limited

deposition.  [*Id.*, PgID 4249-51].  She testified that any materials that she

threw away after the December 2015 deposition were only duplicates. [*Id.*,

PgID 4262-63].  But she did admit to whiting-out some personal notes and

tearing out a page from documents that she had turned over. [5]  [*Id.*, PgID

4270, 4273-75, 4279].

 After Ford's testimony was completed, Hawkins took the stand and

described his attempts to persuade Ford to cooperate with the discovery

requests at issue.  He said that Ford told him "that her journals and logs

were hers, they were personal and I just kept working at trying to have her

at least show them or turn them over to me so I could review them."  [R.

133, PgID 4286].  Ford told Hawkins that she was not comfortable turning

over her "personal journals," and by "personal" she meant that they were

her personal property, and not that they contained information that was

personal in nature.  [*Id.*, PgID 4287].

 Hawkins testified that Ford told him that she had converted her

---

[5] Ford was sometimes uncooperative during the hearing.  When asked
about her having torn out a page, she chastised defense counsel, "Why
would you ask me something about – those are my personal notes during
my son's criminal case."  [R. 133, PgID 4273-75].  She responded to
another question by stating, "Maybe it's not for all to know but it's for me to
know.  They're my own personal stuff."  [*Id.,* PgID 4263-64].  At other times,
she answered questions with, "If you say so" or something similar. [*Id.*,
PgID 4258-59, 4270, 4278].

personal journals and logs into Word or WordPerfect format, and that

"certain documents had been destroyed . . . . She was not comfortable in

saying all." [*Id.*, PgID 4286-87]. Despite Ford's testimony during her

December 2015 deposition to having logs, journals and notebooks,

Hawkins testified that he "never knew" that she had original documents in

her possession, that he never provided to the defense the purported Word

or WordPerfect copies of Ford's personal documents and, most troubling,

that he never asked for them. [*Id.*, PgID 4287-88, 95]. Yet, he also

asserted that he made a diligent inquiry before filing his response to the

motion to compel in which he stated that all of her personal documents had

been destroyed and converted to electronic form, and that he filed that

response in 100% good faith. [*Id.*, PgID 4287-88].

Prior to the June 2015 hearing, defendants had served plaintiff with a

subpoena requesting copies of everything that was in the photographs that

had been taken before the limited deposition. As a result, Ford brought

additional documents that she had not allowed Hawkins to view because

she deemed them to be not case related. [R. 133, PgID 4305-10]. But in

the limited deposition, she had described the documents in the

photographs as being case related. [R. 99-3, PgID 1451-53, 1456-60].

Hawkins was aware that Ford had held back some materials when he filed

12

the inventory in March 2016, but Ford would not allow Hawkins to see
them. [R. 133, PgID 4311].  The Court encouraged Ford to allow Hawkins
to review the additional materials, and she reluctantly agreed.  [*Id.*, PgID
4314-16].  The Court again warned Ford that her son's case was in
jeopardy and that future failures to comply with discovery could result in
dismissal of his case.  [*Id.,* PgID 4317].  But during a sidebar between the
Court and the attorneys, Ford took some documents out of the stack that
she had given Hawkins to review.  [*Id.*, PgID 4320-21].  She said that she
only took out some deposition transcripts.  [*Id.*].

After the hearing, defendants filed a supplemental brief in support of
their motion for sanctions, and attached plaintiff's second supplemental
response to defendants' third request for production of documents, which
was served on defendants on June 7, 2016.  [R. 139-7].  The second
supplemental response included a log indicating that some documents
were covered by the attorney-client privilege and that others were Ford's
medical records.  [*Id.*, PgID 5318]. Other itemized documents were turned
over at the conclusion of the June 2016 hearing.  [*Id.*, PgID 5316-17].
Hawkins referred to those itemized documents as well as the ones that
were turned over on May 23, 2016 when responding to the specific
requests for Ford's logs, blogs, journals and diaries in their native forms,

13

but none of those documents were responsive to those specific requests.

[*Id.*; R. 139, PgID 5298-5301]. In fact, in arguing that defendants had

suffered no prejudice, Hawkins admitted:

> "[T]he information that was eventually produced consisted
> merely of web articles, Ms. Ford's medical specials, and various
> other articles, which appeared to have all been researched by
> her and on her computer, and none of which, are directly
> related to her son, Tony Beard's case now before the court. For
> example, a lot of the data consisted of statistical information
> and articles concerning police misconduct actions involving
> persons of color, etc.

[R. 143, PgID 5401].

The hearing resumed on August 3, 2016. [R. 145]. The notice of

hearing indicated that the Court would begin by announcing its

determination with respect to Hawkins and that, afterwards, it would

entertain the issue regarding whether Ford should be separately

sanctioned. [R. 132, PgID 4186]. Ford was notified that she needed to

either secure her own counsel or represent herself. [*Id.*].[6] In accordance

with the notice, the Court began the August 3 hearing by giving an oral

ruling[7] that it would sanction Hawkins with half of the defendants'

---

[6] This notice indicated that the continued hearing would be on June 29,
2016, but the Court adjourned the hearing after defendants' filed a
supplemental brief. [R. 141]. Ford was again advised to secure
independent counsel or represent herself. [*Id.*].

[7] Since defendants moved for dismissal as a sanction, their motion is
dispositive and the Court was mistaken in issuing an oral ruling; a report

14

reasonable expenses and consider his violation of his discovery obligations when determining whether the case should be dismissed. [R. 145, PgID 5772-82]. The evidentiary hearing then resumed with the question turning to whether Ford should be sanctioned.

Defendants called Ford back to the stand, and she again testified to having been under medication at the time of the December 2015 deposition due to an earlier surgery. [R. 145, PgID 5783-84]. Ford described the issues regarding the production request as a big misunderstanding because she could not even write the previous June through October; her motor skills were gone. [*Id.*, PgID 5785]. Hawkins had been very upset with her because, prior to the limited deposition, he did not realize that she had so much stuff. [*Id.*, PgID 5788-89]. Ford testified, "I don't have any handwritten journals. I don't know where they are." [*Id.,* PgID 5790]. She did not provide Hawkins with any handwritten journals and never typed anything except the attendant care records into electronic form. [*Id.*, PgID 5790-92]. Ford said that she had given defendants all of the documents that she has on her current computer, but a lot were lost on an older computer the prior September. [*Id.*, PgID 5792].

After Ford's testimony was complete, she called her daughter,

---

and recommendation is required. 28 U.S.C. § 636(b)(1).

Tenisha Mayfield, to the stand.  [R. 145, PgID 5795].  Mayfield is a professional insurance litigator and handles attendant care claims.  [*Id.*].  She testified that the only journals that her mother had were attendant care logs that she recommended that her mother prepare for Beard's insurance claim.  [*Id.*, PgID 5795, 5797, 5804-05].  But Mayfield acknowledged that she could not say that she knew exactly what her mother had written.  [*Id.*, PgID 5805].  Ford had a lot of "junk" in her bedroom that had nothing to do with Beard's case, so Mayfield and others threw away some of it and packed up the rest before her surgery.  [*Id.*, PgID 5796, 5808].

According to Mayfield, Ford was very sick and confused last year with mobility and neurological issues, and did not understand half of the things that Mayfield said to her.  [*Id.*, PgID 5796-98].  Those issues persisted, as Ford still had trouble with understanding.  "As your daughter, that's hard for me."  [*Id.*].  Referring to Ford's testimony earlier that day, Mayfield told her mother, "I don't think you really understood him and I think the question was clear so you know that's bothering as your daughter." [*Id.*, PgID 5799].  Mayfield did not believe that Ford intended any malice, and that the issue was confusion, not purposeful reluctance.  [*Id.*, PgID 5799, 5808].

Hawkins then took the stand as the final witness.  He testified that she turned over everything that he received from Ford and agreed that the

16

computer printouts that he produced were attendant care records.  [R. 145, PgID 5814].  The records were "thin" and did not cover the entire relevant time period.[8]  [*Id.*, PgID 5818]. Hawkins was asked whether it was "true that you never turned over any Word or Word Perfect documents of personal journals where Ms. Ford was describing the hell that she . . . had gone through or her feelings, her observations of what her son was going through other than attendant care records."  [*Id.*, PgID 5817].  He agreed that that was true, but continued that he "never saw such journals even when I asked for those journals."  [*Id.*].  Hawkins said that Ford told him that she did not have the two-book personal journal that she had described in her December 2015 deposition.  [*Id.,* PgID 5820-21].  She told Hawkins that her testimony that she had the journals was prompted by her dislike for defense counsel; "I didn't like his attitude or approach.  And so I said what I felt I needed to say."  [*Id.*].  Hawkins had never turned over electronic discovery in its native form.  [*Id.*, PgID 5823].

## III.   ANALYSIS

### A.

Several rules are implicated by the allegations of discovery abuses at

---

[8] The documents dated back to only November or December 2013.  [R. 145, PgID 5829-31].

issue here.  First, Hawkins was required to sign discovery responses to certify that to the best of his "knowledge, information, and belief formed after a reasonable inquiry," the responses were complete, correct at the time made, consistent with the law and nonfrivolous.  Rule 26(g).  An objective standard, the "duty of 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances."  Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).  Rule 26(g) "requires a court to impose sanctions for any violation without 'substantial justification.'" *Jones v. Illinois Central R. Co.*, 617 F.3d 843, 854 (6th Cir. 2010) (citing Rule 26(g)).  A violation of Rule 26(g) triggers sanctions that include an order to pay the opposing party's reasonable expenses (including attorney's fees) caused by the violation.  Rule 26(g)(3).

Federal Rule of Civil Procedure 37 is also implicated.  That rule allows sanctions against a party who has responded to a discovery request in a manner that is evasive or incomplete.  Rule 37(a)(3) & (4).  Evasive and incomplete answers to discovery requests are tantamount to no answer at all, meaning that sanctions up to and including dismissal are available.  *See Laukus v. Rio Brand Inc.,* 292 F.R.D. 485, 502 (N.D. Ohio 2013) (citing Rule 37(b)(2)(A)(i)-(iv); Rule 37(d); and *Jackson by Jackson v.*

18

*Nissan Motor Corp. in USA*, 888 F.2d 1391, 1989 WL 128639 (6th Cir. Oct. 30, 1989) (unpublished)).

Sanctions against either a party or an attorney, or both, are available under the Court's inherent authority. *Telechron Inc. v. Intergraph Corp.*, 91 F.3d 144, 1996 WL 370136 (6th Cir. July 2, 1996) (unpublished).  The broad discretion under the inherent authority permits the Court to fashion an appropriate sanction for misconduct, including the assessment of attorney fees and involuntary dismissal.  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 n. 7 (6th Cir. 2002) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).  "[A] court's reliance upon its inherent authority to sanction derives from its equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings." *First Bank of Marietta*, 307 F.3d at 512.  The Court need not inquire into the wrongdoer's ability to pay monetary sanctions.  *Telechron*, 1996 WL 370136 ,at *2.  Sanctions are available under the Court's inherent authority for unethical, obstructive or violative conduct even absent a finding of bad faith, and regardless of whether a rule of civil procedure is "up to the task." *Id.*; *First Bank of Marietta*, 307 F.3d at 513, 519-20.

A violation of an attorney's duty of candor is sanctionable under the Court's inherent authority. *United States v. Shaffer Equip. Co.*, 158 F.R.D.

19

80, 87 (S.D.W. Va. 1994). The Michigan Rules of Professional Conduct impose a duty of candor to the court and opposing counsel, prohibiting an attorney from making a false statement and requiring him to correct any false statements that were previously made. M.R.P.C. 3.3(a)(1). An attorney's statement to a court must be based on a reasonably diligent inquiry, and "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." Rule 3.3, comments. The Eastern District of Michigan's Local Rules explicitly adopt the Michigan Rules of Professional Conduct, and warn that violation of those rules is a ground for discipline. E.D. Michigan LR 83.22(b).

**B.**

Hawkins should be sanctioned. He admitted to violating Rule 26(g), [R. 133, PgID 4227], but otherwise has suggested that he did the best that he could with a difficult client. Hawkins (through his attorney) argued that the Court was holding him to a higher standard than other attorneys. [R. 145, PgID 5771-73]. These arguments are troubling because they suggest that Hawkins does not appreciate the importance of adhering to discover rules and the many ways in which he failed to do so.

It is unclear whether Hawkins conducted a reasonable inquiry prior to the December 2015 deposition before Ford failed to produce the

20

documents requested in the *duces tecum* deposition notice or to properly
object to that notice.  But Ford's freely stated admission during the
deposition that she had other case-related documents – "I sure do"[9] –
suggests that his inquiry was insufficient.  More troubling were Hawkins'
responses to the Third Request for Production of Documents.  In his first
response, he claimed that the requested documents were privileged, but he
did not include a privilege log;[10] he had not seen the documents to assess
whether they were privileged; and his evasive answer was tantamount to
no answer at all.  *Laukus,* 292 F.R.D. at 502.  Thus, these responses flunk
Rule 26(g)'s duty of reasonable inquiry, and are sanctionable under Rule
37(a)(3), (a)(4) and (d).

Hawkins dug himself deeper by filing a response to defendants'
motion to compel in which he claimed that Ford's handwritten logs and
journals had been trashed or thrown out after being typed into an electronic
format.  Both Hawkins and Ford denied that she had told him that she had
destroyed all of her handwritten documents, and Hawkins testified that the
only electronic documents that he knew about were the attendant care
records.  At one point, Hawkins testified that he never even asked to see
the personal journals.  He also said that Ford had told him that she never

---

[9] R. 62-3, PgID 775-76.
[10] A privilege log is required by Rule 26(b)(5)(A)(ii).  [R. 65, PgID 882].

had the two handwritten books describing the hell that she and Beard had gone through; she had made that up because she did not like defense counsel's attitude.

Hawkins' claim that the handwritten books were privileged, followed by his misrepresentation that Ford had claimed to have thrown out or destroyed them after converting them into electronic form, caused the Court and defense counsel to engage in a prolonged and needless effort to secure production of the personal journals and secure the truth about what happened to them. His actions "wasted judicial resources and ha[ve] diminished the ready availability of those resources to deserving litigants. [He] exceed[ed] the bounds of advocacy open to counsel as [an] officer[ ] of the court." *Maier v. Orr,* 758 F.2d 1578, 1584 (Fed. Cir. 1985).

Hawkins' assertion that he was doing the best he could under difficult circumstances demonstrates that he fails to appreciate his duty of candor as defined by Rule 3.3. If he could not advocate on behalf of Beard without violating his duty of candor, he could have withdrawn as Beard's counsel. *See Davis v. State Farm Fire & Cas. Co.*, 351 F.App'x 990, 991 (6th Cir. 2009) (attorney met requirements for withdrawal when she could not advocate for client without violating duty of candor).  What Hawkins was not allowed to do was to obscure the truth in order to protect his client or his

22

case.

The actions of the attorney in *Murry v. Chrysler Grp. LLC*, No. 10-14634, 2012 WL 592043, at *1 (E.D. Mich. Jan. 5, 2012), *report and recommendation adopted*, No. 10-14634, 2012 WL 592025 (E.D. Mich. Feb. 23, 2012), provide a useful comparison.  The plaintiff had been ordered to complete her deposition and produce documents and tape recordings.  Appearing at the deposition, the plaintiff "forgot" the tape recordings and brought a suitcase full of unorganized documents that took four hours to review. She did not identify which documents were responsive to which requests for production of documents and admitted that she had more relevant documents that she did not bring.  In response to the defendant's motion to dismiss or to compel, the plaintiff's counsel moved to withdraw and filed an affidavit confirming the accuracy of the defendant's allegations.  *Id.* at *1-*3.  Hawkins, by comparison, raised a frivolous privilege objection, filed a misleading response to the motion to compel, and appeared at the limited deposition with only photographs of documents that Ford testified were case related.  Then, after the Court ordered an evidentiary hearing regarding defendants' motion for sanctions, Hawkins delivered documents to defense counsel and submitted an inventory of those documents in a supplemental brief in May 2016, but he failed to

23

disclose until pressed by the Court that Ford had held back documents that were shown in the photographs even though she had testified that they were case related.

Hawkins was required by Rule 34(b)(2)(C) to specify any objections to the production of requested documents and whether any documents were being withheld as a result.  Furthermore, he was required to specify what he was producing for each requested item or category, and to certify the production by his signature.  Rule 34(b)(2)(B); Rule 26(g).  His May 2016 delivery of the documents with an accompanying inventory was insufficient because it did not specify which documents were responsive to which request, and it was not certified.  And, although Hawkins certified the June 2016 supplemental response to the requests for the production of documents, he still failed to identify which documents were responsive to which requests.  In fact, Hawkins later confirmed that none of the documents that he produced were the requested journals or diaries; he and Ford claimed that such documents never existed.  Generally speaking, Hawkins demonstrated a lack of care with respect to the specific requirements of Rule 26(g) and Rule 34(b), and his failures to comply are sanctionable under Rule 26(g) and Rule 37.

Hawkins' violative conduct and lack of candor are also sanctionable

24

under the Court's inherent authority. *First Bank of Marietta*, 307 F.3d at 512-13, 519-20; *Shaffer Equip Co.*, 158 F.R.D. at 87. For this violative conduct and lack of candor, Hawkins should be ordered to reimburse defendants for half of the reasonable expenses, including attorney's fees, they incurred from the litigation of their motion for sanctions. The Court recommends assessing Hawkins half the amount because Ford's conduct was the primary cause of the needless efforts to secure the requested documents, which she now claims never existed.

## C.

Despite its attempts, the Court was unable to uncover the truth with respect to whether Ford had handwritten books. She testified in detail at the December 2015 deposition about the books into which she had written her most personal feelings and observations of Beard, and vehemently objected when told that she would have to produce them. Nonetheless, during the evidentiary hearings, Ford testified that she has turned over everything to Hawkins and that the only documents that she destroyed were duplicates. According to Hawkins, Ford told him that she never had the documents that she testified to possessing, and Mayfield testified to seeing no personal journals when she cleaned out Ford's room prior to her surgery.

25

In addition to the contradictory statements regarding personal journals, Ford's conduct was otherwise obstructive. She did not disclose until after her December 2015 deposition that she possessed voluminous documents that were potentially case-related and then refused to allow Hawkins to see a number of them. She acknowledged whiting out some handwritten notes on documents that were turned over, and tearing out some pages. Additionally, she testified during the limited deposition and the evidentiary hearing that her testimony during the December 2015 hearing was unreliable; she could have said anything because she was high from her medications. She made this claim even though she testified during the December 2015 deposition that she had taken only Motrin.

Under most circumstances, the Court would find this type of obstructive behavior to be sanctionable with monetary penalties. What gives the Court pause in this case is that Mayfield credibly testified that Ford's conduct was the result of mental deficits. Mayfield said that her mother had been very sick in 2015, and that she suffered from mobility and neurologic limitations and confusion. Her testimony was from the perspective of a clearly concerned daughter as well as an insurance adjustor who handles attendant care claims. [R. 145, PgID 5801]. Notably, Ford's demeanor during her December 2015 deposition prompted defense

26

counsel to question whether she had taken medications that affected her ability to hear, think or respond. [R. 62-3, PgID 718].  And the Court is without expertise to assess whether Ford's uncooperative conduct during the evidentiary hearings was caused in part by mental deficits.

At the August 2016 hearing, Ford agreed to step down as Beard's guardian and to have Mayfield take her place; Hawkins said that should take about 45 to 60 days after the hearing.  [R. 145, PgID 5842, 5848, 5861-62].  Given the questions regarding Ford's mental health, the best course of action is to simply require her to be removed as Beard's guardian pursuant to plaintiff's stipulation, and to preclude her from testifying on Beard's behalf.

### D.

Defendants argue that this case should be dismissed as a sanction for Hawkins' and Ford's conduct.  The Court disagrees.

When assessing whether an action should be dismissed as a Rule 37 sanction for failure to cooperate in discovery, a court must evaluate "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or

27

considered before dismissal was ordered." *United States v. Reyes*, 307

F.3d 451, 458 (6th Cir. 2002) (citation and internal quotation marks

omitted). Courts are reluctant to dismiss an action merely to discipline an

errant attorney; the preference is to directly sanction the attorney rather

than an innocent client. *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 366-

68 (6th Cir. 1997). Defendants cite *Harmon* as supporting their claim that,

as Beard's representative, Ford's misconduct can warrant dismissal. [R.

139, PgID 5227]. But the same reluctance to sanction Beard for Ford's

conduct is also warranted.

In *Harmon*, the attorney failed to respond to the opposing counsel's

requests, failed to respond to a motion to compel, failed to comply with a

court order to fully respond to discovery requests, and failed to respond to

a motion to dismiss even after being granted an extension of time to do so.

"This record is more than adequate to establish that Harmon's counsel was

stubbornly disobedient and willfully contemptuous." *Id.* at 368.

Here, the Court has already determined that Hawkins is at fault for his

lack of candor and violations of the rules of discovery. But his conduct was

not comparable to the attorney's in *Harmon*; he was not stubbornly

disobedient or willfully contemptuous. Hawkins did respond to discovery

requests and to defendants' motions, and a monetary penalty is sufficient

to address the deficiencies of those responses.  Ford has appeared to be stubborn and willful, but as noted, her inappropriate conduct may be due in part to mental deficits.  Dismissing Beard's claims based upon Ford's misconduct would therefore not be justified.

The Court is also not convinced that defendants have been substantially prejudiced by Hawkins and Ford's conduct, especially if Ford is precluded from testifying in Beard's case in chief (while allowing defendants to call Ford for impeachment purposes).  During the August 2016 hearing, defense counsel was asked how defendants' case would be prejudiced if Ford was no longer permitted to participate in the litigation. Defense counsel answered that removing Ford would affect their deliberate indifference claim because she testified that the Taser marks on Beard did not show up until the day after his arrest, which explained why they did not immediately seek medical care on his behalf.  [R. 145, PgID 5838-39]. However, plaintiff agreed to dismiss the deliberate indifference claim.  [*Id.*, PgID 5849].

Defendants also argued that they have been deprived of her records that address Beard's claims of emotional distress and that their neuropsychologist, Bradley Merker, Ph.D., relied in part on his interview of Ford to form his opinions.  [*Id.*, PgID 5840, 5843].  But defendants may rely

29

upon Beard's testimony as well as the records and testimony of his treating psychiatrist since 2009 to address Beard's emotional distress claim; Dr. Merker's opinion is based in large part of his interview and evaluation of Beard, as well as his psychiatrist's records; and defendants could still call Ford to impeach Beard.  [*Id.,* PgID 5855-57].  Defendants asserted that Dr. Merker's opinion would not be admissible without Ford's testimony, but Federal Rule of Evidence 703 provides that the facts and data upon which an expert relies need not be admitted.  What is more, it is not clear that Ford even had any handwritten journals and, even if she did, their evidentiary value is speculative at best.

The next question is whether Hawkins or Ford had been previously warned that failure to cooperate in discovery could result in dismissal. Here, the Court warned Ford that withholding discovery could jeopardize her son's case, and thereafter issued warning to both Hawkins and Ford that failure to cooperate with discovery could result in dismissal.  [R. 114, PgID 1936; R. 130, PgID 4150; R. 141, PgID 5374].  Despite these warnings, Hawkins continued to violate Rule 34 and his duty of candor, and Ford obstructed her attorney from assessing whether documents that she had previously identified as being case related should be turned over.

Nonetheless, the final factor requires the Court to assess whether

sanctions less drastic than dismissal would be sufficient.  Given that Beard

is an innocent client, that Hawkins was not stubbornly disobedient and

willfully contemptuous, that Ford's conduct may result in part from mental

deficits, and that the prejudice to defendants is questionable, a monetary

penalty against Hawkins is sufficient.  Dismissal is not warranted.

## IV.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS GRANTING IN
PART** defendants' motion for sanctions [R. 99], finding that attorney

Johnny L. Hawkins' conduct is sanctionable pursuant to Federal Rules of

Procedure 26 and 37, and that both Hawkins and Ford should be

sanctioned under the Court's inherent authority; **ORDERING** Hawkins to

reimburse defendants for half the reasonable expenses, including

attorney's fees, they incurred from the litigation of their motion for

sanctions; **ORDERING**, pursuant to Beard's stipulation and as a sanction,

that Tenisha Mayfield take the place of Ford as Beard's guardian and

representative in this action; **ORDERING**, pursuant to Beard's stipulation

and as a sanction, that his claim for deliberate indifference to his serious

medical needs be stricken; **ORDERING** that Ford cannot testify in Beard's

case in chief, but that defendants retain the right to call her for

impeachment purposes; and **DENYING** defendants' request for dismissal.

31

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: September 13, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P.

72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of

HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers

Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 13, 2016.

s/Marlena Williams____
MARLENA WILLIAMS
Case Manager